IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 21, 2026

**STATE OF TENNESSEE v. KELLEY IRENE ENGEL GAMBILL**

**Appeal from the Criminal Court for Davidson County**
**No. 2022-B-1125     Jennifer Smith, Judge**
_____

**No. M2025-00227-CCA-R3-CD**
_____

The Defendant, Kelley Gambill, appeals her Davidson County Criminal Court conviction of aggravated cruelty to animals, for which she received a sentence of two years' supervised probation.  On appeal, the Defendant argues that the trial court misconstrued the statute's "no justifiable purpose" language and challenges the sufficiency of the evidence supporting her conviction.  Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

STEVEN W. SWORD, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and JOHN W. CAMPBELL, SR., JJ., joined.

Nathan Cate, Nashville, Tennessee, for the appellant, Kelley Irene Engel Gambill.

Jonathan Skrmetti, Attorney General and Reporter; Park Huff, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Deborah Housel, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.     FACTUAL AND PROCEDURAL HISTORY**

On June 15, 2022, the Defendant was charged by indictment with one count of aggravated cruelty to animals[1] based upon her alleged amputation of a portion of a kitten's leg. The kitten subsequently died. The Defendant waived her right to a trial by jury. A bench trial was held on February 20, 2024.

The facts in this case are generally undisputed. Kelsey Carlin testified that she worked as the intake coordinator at the non-profit Nashville Humane Association (NHA) in Davidson County. She stated the NHA was open seven days a week, from 10:00 a.m. to 5:00 p.m. She testified that although the facility was not open to the public on Mondays, it was fully staffed, and a staff member would still answer the phone or the door if contacted. She explained that her job included the initial review of every animal that came into the facility to determine if the facility could take it in and provide treatment if needed.

Ms. Carlin testified that on Tuesday, May 10, 2022, at approximately 3:00 p.m., the Defendant came to the NHA with a kitten in a box. The Defendant told Ms. Carlin that she had amputated the kitten's leg at her home. The Defendant further stated that she had watched a video on Google before the amputation. Ms. Carlin testified that she immediately asked to take the kitten to see the staff veterinarian, but the Defendant tried to stop her to explain what had happened and why she had amputated the kitten's leg. Ms. Carlin stated that she recognized the kitten's "dire need," told the Defendant to stop explaining and said that they could talk in a moment because the kitten needed to go to the NHA's clinic to be assessed. While Ms. Carlin took the kitten to the clinic, someone else took the Defendant to Ms. Carlin's office.

Ms. Carlin then returned to her office and spoke at length with the Defendant. There, the Defendant told her that a young boy had brought the injured kitten to her home and that she had amputated his injured leg. The Defendant told her that the kitten had been meowing a lot when she first saw it. Because Ms. Carlin was not a veterinarian, she asked the Defendant to write out what had happened, and the Defendant did so. In addition, Ms. Carlin was present when the Defendant made a recorded statement to both her and Dr. Megan Anderson, who also came to speak with the Defendant in Ms. Carlin's office. Ms. Carlin testified that the Defendant always stated that she acted to save the kitten's life.

---

[1] The indictment also charged the Defendant with one count of delivery of a schedule II controlled substance and the unlicensed practice or attempted practice of veterinary medicine; however, both of these charges were dismissed by the State prior to trial.

Dr. Megan Anderson testified that she was a veterinarian and had worked as the NHA's medical director for six years. She testified that she was working on May 10, 2022, when the Defendant brought the kitten to the NHA for care and described the kitten's condition, accompanied by photos and a video of the kitten while at the NHA. She testified that she visually assessed the kitten before going to Ms. Carlin's office to speak with the Defendant, while another staff doctor continued to assess the kitten. Dr. Anderson described the kitten as approximately eight weeks old and in a very debilitated condition. She stated that the kitten barely opened his eyes, had very shallow breathing, and had a medical sock net over the back half of his body when he arrived. Dr. Anderson also described how the kitten's temperature, pulse, respiration, and anal tone were assessed and how the observations indicated the kitten's ability to feel pain. She described the kitten as "not really responsive to stimuli, potentially very close to losing consciousness, [and] not responsive at all." She also stated that the kitten was severely dehydrated. Dr. Anderson later confirmed that the kitten had also suffered some spinal trauma and that the kitten might have been anemic or did not have a good blood volume. Dr. Anderson stated that she understood the Defendant had described the kitten as stable, but she opined that "[n]othing about the pet on presentation even remotely suggest[ed the] patient was stable." Dr. Anderson testified that she could not say if the kitten was paralyzed without more information because an animal can have motor deficiencies that make it appear to be paralyzed while still feeling "deep pain."

Dr. Anderson testified that the kitten meowed when she removed the sock net. She stated that she then began to remove the tape, which removed some of the kitten's fur and made the kitten meow. Dr. Anderson opined that this was an indicator of pain, so she paused the tape removal to administer some "heavy duty pain medications" for the kitten. The removal of the sock net revealed a "very chronically exposed bone" with jagged edges, and the exposed bone was longer than the skin. Dr. Anderson described the bone marrow as discolored and the fur and tissue as dried out and plastered to the apparently devitalized bone. She described a tendon that was exposed and "hanging out," as well as an exposed muscle. Dr. Anderson could not be sure when the kitten's injuries had occurred, as the only information available to her was the date the Defendant's neighbor brought her the injured kitten. However, Dr. Anderson testified that it could take up to several days for an infection to occur and that amputating the kitten's leg would not result in the infection going away. She stated that, depending on how old the wound was, a good possibility existed that the infection would spread to the bloodstream. She opined that antibiotics would have been necessary and the first step in treatment, rather than amputation.

Dr. Anderson stated that the kitten should have been stabilized initially with fluids and that a complete baseline diagnostic assessment should have been performed, including X-rays and wound care. She opined that if the kitten had been brought to the clinic first it would have taken approximately a week to determine if surgery was an appropriate option.

She further opined that the kitten would have felt pain during the amputation without proper medications and anesthesia. She testified that pain in animals presents in different ways. She stated that the pain medication used by the Defendant was not a "heavy duty" pain medication and was not adequate pain control for such an amputation. She also stated that the kitten's fur had not been properly removed, the wound was not properly sealed, and the bone was left exposed under the bandage after the amputation. She opined that these actions would have left the kitten more prone to infection.

Dr. Anderson stated that the Defendant had various care options for the kitten, including a general veterinary practice in normal office hours or emergency veterinary clinics open twenty-four hours a day. She stated that despite the Defendant's lack of financial means, no veterinarian would allow an animal to suffer and, at a minimum, would have helped to alleviate any suffering. She described the Defendant's treatment of the kitten as "heartbreaking." Dr. Anderson testified that the kitten passed away within several hours of arriving at the NHA clinic.

Dr. Anderson stated that the Defendant's description of the kitten as "doing great" and not complaining much did not represent the condition of the "very obtunded animal" that was "barely responsive" upon arrival at the NHA. She opined that nothing in the initial assessment even remotely suggested the kitten was stable. Dr. Anderson testified that, based upon the assessment of the kitten and the postmortem X-rays, "[i]n a case such as this, humane euthanasia absolutely would have been an acceptable treatment and approved treatment for this pet."

Dr. Anderson also stated that the "owner surrender contract" completed for the NHA contained written statements made by the Defendant. Dr. Anderson read a portion of the statement into the record, stating:

> We have already made this kitten a part of our family. We love him and would like to keep him as such. We have taken care of this stray kitten with injuries. Something to me by -- oh, maybe brought to me by neighbor for help. Will I be maintaining kitten?
>
> And then it said: I would like to be first right -- first refusal of this kitten when he is ready to go home.

On cross-examination, Dr. Anderson discussed the compassionate care offered at emergency veterinary clinics, including antibiotics, pain medications, and fluids, to help animals until they receive other veterinary care. She also agreed that the kitten's X-rays showed that he suffered some damage to the cranial area. She agreed the kitten had suffered

significant trauma and injuries, but she testified that antibiotics should have been the first step in treating the kitten's injuries. On redirect examination, Dr. Anderson testified that despite the Defendant's statements that she did not want the kitten to die, the Defendant "failed to see the magnitude of the inappropriate acts and horrific acts, quite frankly, that she had done to this cat."

The State rested. Following an unsuccessful motion for judgment of acquittal, the Defendant elected to testify.

The Defendant testified that on May 8, 2022, at approximately 5:00 p.m., a young boy, who was one of the Defendant's neighbors, found an injured kitten, which he brought to the Defendant's home to seek assistance for the kitten's injuries. The Defendant admitted she was not experienced or knowledgeable in veterinary medicine, but that she had been a nurse for twenty-six years and wanted to help the kitten. The Defendant visually inspected the kitten, whom she observed had a back leg that was mangled and broken in several places and had several tears. The Defendant stated that the kitten looked to be in great distress and pain, appeared limp, and was "crying nonstop." The kitten did not move or meow much. The Defendant testified that she attempted to call various veterinary offices but that no one answered because it was Sunday. She testified that she called two or three emergency care veterinary clinics but that she did not have the money to pay for care at those facilities. The Defendant stated that she wanted to help the kitten and did not want it to be euthanized. She was concerned that, due to the severity of the kitten's injuries, he would be euthanized because she could not afford expensive veterinary care. Thus, she chose not to take the kitten to an emergency care veterinary clinic.

The Defendant testified that she also feared the kitten would develop an infection in his leg wound. She stated that following her evaluation of the kitten, she believed the kitten was likely paralyzed in both his back legs and his tail. The Defendant researched the injury online and decided to amputate a portion of the kitten's leg using medical supplies she had in her home. She denied having watched a video of how to amputate the leg. She hydrated the kitten with a saline syringe. She used pain medication she still possessed from another cat's prior surgery a year or two previously, but she was concerned about overdosing the kitten; she stated she gave one dose prior to the amputation and two more doses after. She used garden shears or branch cutters to amputate the kitten's leg at approximately 10:30 p.m. She discussed how she attempted to sterilize the instruments by cleaning them with bleach and then boiling them. She also used yarn to make a tourniquet. She testified she did not use anesthesia. The Defendant stated that she applied pressure for fifteen minutes to ensure that the bleeding had stopped, she cleaned the wound, and she placed a pressure bandage on the wound. The Defendant then put a medical sock over both the kitten's legs and tail as a bandage. The Defendant stated that the kitten's condition had improved after the amputation; he appeared more alert and cried less. She stated that when he was placed in a blanket, he would move "down a little bit with his front paws and his upper body, [and]

he would pull himself back up so that he was back up here because he liked being underneath and around the neck area." She also stated that the kitten drank a little water, as well as a broth-and-water mixture, but did not urinate or have a bowel movement after the amputation. The Defendant admitted she did not obtain antibiotics for the kitten or take the kitten for treatment or care on Monday, May 9. She did not remove the bandage before taking the kitten to the NHA.

The defense rested. At the conclusion of the bench trial, the parties made closing arguments, during which the trial court asked whether the phrase "no justifiable purpose," as contained in the statute, created an objective or subjective standard. The State argued that the standard was an objective standard based upon reasonableness and not based upon what a defendant thinks in his or her mind. The State further argued that the evidence was sufficient because it demonstrated that the kitten suffered for two days with little pain medication after the Defendant cut off part of his leg with branch clippers. The State argued that the kitten suffered and that his pain was evident from his behaviors as testified to at trial. The State argued that the Defendant had three choices: "She could do nothing, she could take it and get some help, or she could do something that did nothing but exacerbate the pain." The State argued that the Defendant chose option three because of her own views against euthanasia rather than what would have been best for the kitten.

The Defendant argued that the trial court could not confuse a justifiable purpose with the method employed.[2] When the trial court asked the Defendant what proof there was to support justification, defense counsel responded that the open and exposed nature of the kitten's wound was more likely to be susceptible to infection and that the Defendant had, "right or wrong," attempted to remove any infection. The Defendant asserted that despite the evidence of the potential of suffering and the injuries involved, as well as the kitten's meowing when the bandage was removed, there was no evidence to contradict that she did not believe the animal to be in pain. As to the issue of the standard to be applied to a "justifiable purpose," the Defendant focused her argument on the distinction between the method used and the purpose.

Following the conclusion of closing arguments, the trial court noted that the facts were largely undisputed and then discussed the evidence presented. Then, the trial court made the following findings:

---

[2] The relevant portion of the cruelty to animals statute at the time of the offense stated, "[a] person . . . , with no justifiable purpose, . . . intentionally or knowingly . . . [k]ills, maims, tortures, . . . mutilates, . . . or otherwise causes serious physical injury, a substantial risk of death, or death to a companion animal or intentionally causes serious physical injury to a companion animal." Tenn. Code Ann. § 39-14-212(a)(1) (Supp 2021).

In the [c]ourt's view, the [D]efendant's actions on May the 8th amounted to mutilation of a helpless animal and torture, which is defined as an act causing unreasonable physical pain and suffering. . . . The only issue is whether the [D]efendant acted with justifiable purpose.

The statute, as I indicated during arguments, does not define justifiable purpose. But in common parlance, justifiable purpose is a reason that can be defended as being just, right, or warranted.

The [c]ourt is also guided by a quotation from American Jurisprudence 2d on animals, which is a compilation of cases from across the country, which states that: In the context of animal cruelty statutes[,] an act is consider[ed] justifiable where its purpose or object is reasonable and adequate and the pain and suffering caused is not disproportionate to the end sought to be attained.

That definition and explanation of that term sort of rings true and correct to the [c]ourt. And that guides the [c]ourt today.

In the [c]ourt's view, there was no reasonable justification for the [D]efendant's actions in this case.

This animal suffered extreme and prolonged pain. The [D]efendant's actions were – in no way, shape or form amounted to any proper emergency care. The [D]efendant was . . . not qualified to perform any veterinary procedure, let alone the removal of a limb.

The pain and mutilation suffered by the animal in this situation was so disproportionate to any asserted reason as to shock the conscience.

For all of these reasons, the [c]ourt finds that the State has carried its burden of proof beyond a reasonable doubt and that the [D]efendant is guilty of aggravated cruelty to animals.

Following a sentencing hearing on April 24, 2024, the trial court sentenced the defendant to two years of supervised probation, and on May 1, 2024, the trial court entered an order of deferral placing the Defendant on judicial diversion. The Defendant was also ordered to undergo a psychological evaluation and counseling. The Defendant was not required to surrender the two dogs she already owned, but she was prohibited from possessing or owning any additional companion animals during her two-year probationary term. The defendant filed a timely motion for a new trial on May 15, 2024. Following a hearing on October 30, 2024, the trial court denied the Defendant's motion for a new trial on January 16, 2025. This timely appeal followed.

## II.   ANALYSIS

On appeal, the Defendant argues that the trial court misconstrued the "no justifiable purpose" language in the statute by interpreting the phrase as applying an objective standard. The Defendant also challenges the sufficiency of the evidence to establish her conviction for aggravated cruelty to animals, arguing that the State failed to prove that she acted "with no justifiable purpose." The State argues that the trial court properly interpreted the statute and that the evidence was sufficient to support the conviction. We examine these issues below.

### A.  "WITH NO JUSTIFIABLE PURPOSE"

The Defendant asserts that the trial court misinterpreted the phrase "justifiable purpose" within the aggravated cruelty to animals statute by applying an objective standard or "reasonable procedure" test. The Defendant argues that the statutory language requires the fact finder to look at her *actual* purpose and goal in her actions, rather than at the actions themselves, to determine whether she acted with a justifiable purpose. The State argues that the trial court appropriately applied an objective standard. At the time of the offense, and as charged in the indictment, aggravated cruelty to animals was defined in relevant part as occurring when "[a] person . . . , with no justifiable purpose, . . . intentionally or knowingly . . . [k]ills, maims, tortures, . . . mutilates, . . . or otherwise causes serious physical injury, a substantial risk of death, or death to a companion animal or intentionally causes serious physical injury to a companion animal." Tenn. Code Ann. § 39-14-212(a)(1) (Supp 2021).

This issue is one of statutory interpretation, which we review de novo without a presumption of correctness. *Falls v. Goins*, 673 S.W.3d 173, 179 (Tenn. 2023); *State v. Marshall*, 319 S.W.3d 558, 561 (Tenn. 2010). In interpreting statutes, the judiciary's foremost consideration is to give effect to the General Assembly's legislative intent without either restricting or expanding the statute beyond its intended scope. *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995). In doing so, we presume that the General Assembly "knows the law and makes new laws accordingly." *Johnson v. Hopkins*, 432 S.W.3d 840, 848 (Tenn. 2013). Our goal in determining "what a statute means" requires us to determine "how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." *State v. Deberry*, 651 S.W.3d 918, 924 (Tenn. 2022) (first quoting *Waldschmidt v. Reassure Am. Life Ins. Co.*, 271 S.W.3d 173, 175 (Tenn. 2008); and then quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 33 (2012)).

When a statute's meaning is unclear or ambiguous, "we rely upon well-established canons of statutory construction." *State v. Sherman*, 266 S.W.3d 395, 401 (Tenn. 2008). The principle of statutory interpretation *expressio unius est exclusio alterius*, or "the expression of one thing implies the exclusion of others," is helpful in our present analysis. *Richards v. Vanderbilt Univ. Med. Ctr.*, 706 S.W.3d 319, 324 (Tenn. 2025). We may also "look to authoritative dictionaries published around the time of a statute's enactment." *Deberry*, 651 S.W.3d at 925 (citing *State v. Edmondson*, 231 S.W.3d 925, 928 & n.3 (Tenn. 2007)). In interpreting unclear or ambiguous statutes, "[w]e consider the whole text of a statute and interpret each word so that no part will be inoperative, superfluous, void[,] or insignificant" in an effort to give full effect to the General Assembly's intent. *Deberry*, 651 S.W.3d at 925 (internal quotation marks omitted) (quoting *Bailey v. Blount Cnty. Bd. of Educ.*, 303 S.W.3d 216, 228 (Tenn. 2010)). "Statutes in *pari matera*—those relating to the same subject or having a common purpose—are to be construed together." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995) (internal quotation marks omitted) (citing *Wilson v. Johnson County*, 879 S.W.2d 807, 810 (Tenn.1994)).

Our analysis first requires us to determine the ordinary and natural meaning of the phrase "justifiable purpose" as contained in Code section 39-14-212(a)(1). The phrase is not defined in the statute. Although we have previously been called upon to determine the General Assembly's intent in relation to other aspects of this statute, the issue of determining the General Assembly's intent regarding "justifiable purpose" is one of first impression. *See State v. Mainer*, 678 S.W.3d 717, 723-25 (Tenn. Crim. App. 2023) (interpreting the meaning of "companion animal" as used in Code section 39-14-212(a) (2018)); *State v. Barnett*, No. M2009-00756-CCA-R3-CD, 2010 WL 3822880, at *12-13 (Tenn. Crim. App. May 20, 2010) (interpreting the meaning of "depraved and sadistic" as used in Code section 39-14-212(b)(1) (2006)), *perm. app. denied* (Tenn. Nov. 23, 2010).

As asserted by the State, Black's Law Dictionary defines "justifiable" as "[l]egally or morally acceptable for one or more good reasons; excusable; defensible." *Justifiable*, Black's Law Dictionary (12th ed. 2024). Black's defines "purpose" as "[a]n objective, goal, or end." *Purpose*, Black's Law Dictionary (12th ed. 2024). The Defendant asserts that "justifiable" is defined as "having a good reason, or capable of being justified," and that "purpose" relates to the Defendant's "intended goal or objective in acting." However, the Defendant cites to no authority for either definition. The term justifiable is used to modify the term "purpose" within the statute. Therefore, the plain meaning of the phrase "justifiable purpose" entails having a reasonable, excusable, or defensible objective, goal, or end.

Additionally, although "justifiable" is not defined in the aggravated cruelty to animals statute, the General Assembly has addressed justification in the general criminal statutes by providing that "[i]t is a defense to prosecution that the conduct of the person is justified under this part." Tenn. Code Ann. § 39-11-601. Within the same part of the Code, the specific defense of "necessity" provides a definition of justification. While necessity is not raised as a defense here, the language of this statute is instructive:

[C]onduct is justified if:

(1) The person reasonably believes the conduct is immediately necessary to avoid imminent harm; and

(2) The desirability and urgency of avoiding the harm clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to *ordinary standards of reasonableness*.

*Id*. § 39-11-609 (emphasis added). This, too, supports the trial court's application of an objective, rather than a subjective, standard in interpreting the meaning of "justifiable purpose."

Beyond consideration of the plain meaning of the terms, "[i]n construing statutes, Tennessee law provides that courts are to avoid a construction that leads to absurd results." *State v. Curry*, 705 S.W.3d 176, 184 (Tenn. 2025) (quoting *Tennessean v. Metro. Gov't of Nashville*, 485 S.W.3d 857, 872 (Tenn. 2016)) (internal quotation marks omitted); *see also State v. Emerson*, No. W2024-00968-CCA-R3-CD, 2025 WL 2985714, at *8-10 (Tenn.

Crim. App. Oct. 23, 2025), *no perm. app. filed.* The Defendant asserts that "[t]he context here is a criminal prohibition meant to target malicious or sadistic acts of animal abuse" and that "any sincere, humane purpose on the part of the Defendant should suffice" to establish the justifiable purpose language of the statute, regardless of how flawed the methods used to achieve the goal. Although the aggravated cruelty to animals statute previously defined "aggravated cruelty" as "conduct which is done or carried out in a depraved and sadistic manner and which tortures or maims an animal," the terms "depraved and sadistic" were removed from the statute prior to the offense in this case. 2002 Tenn. Laws Pub. Ch. 858 (S.B. 1810) (effective July 1, 2021). The current statute does not require the prohibited behavior to be committed in a "depraved and sadistic" manner. Inasmuch as the Defendant argues that the statutory language should be interpreted in that context, her argument is unavailing because the General Assembly has clearly indicated its intent to remove those considerations from the calculus by removing those terms from the statute.

In addition, relying solely on a defendant's subjective statement to determine whether a justifiable purpose exists, as suggested by the Defendant, could lead to absurd results by allowing a defendant to create a justifiable purpose where one may not exist. Applying an objective or reasonable standard, however, requires the finder of fact to consider the Defendant's asserted subjective purpose in light of the context, circumstances, and outcome of the conduct. This objective standard, combined with the subjective purpose asserted by a defendant, allows the trier of fact to consider all the evidence, which is more in line with the plain and natural meaning of the phrase.

Finally, a review of the case law analyzing the sufficiency of the convicting evidence as it relates to a defendant's acting with a justifiable purpose, supports our conclusion that the General Assembly intended to create an objective, rather than a subjective, standard. Although this is an issue of first impression, this court has nevertheless implicitly concluded that a defendant's actions were objectively performed without a justifiable purpose in previous cases. *See State v. Givens*, No. W2023-00633-CCA-R3-CD, 2024 WL 1507609, at \*12 (Tenn. Crim. App. Apr. 8, 2024) (affirming a defendant's conviction of aggravated cruelty to animals where the proof established that the defendant intentionally lit a house on fire, trapping a dog therein and causing it to subsequently die of smoke inhalation, with the admitted purpose of destroying evidence and creating a diversion for his escape from law enforcement), *perm. app. denied* (Tenn. July 17, 2024); *Mainer*, 678 S.W.3d at 726 (affirming a defendant's conviction of aggravated cruelty to animals where the proof established that the defendant's torture of a caged cat by shooting it five times with an airsoft rife was without justifiable purpose despite the defendant's testimony that he acted due to the cat's dangerous demeanor and that he was unable to safely release it without killing it); *State v. Curll*, No. M2017-00090-CCA-R3-CD, 2018 WL 3146336, at \*8 (Tenn. Crim. App. June 26, 2018) (affirming a defendant's conviction of aggravated

cruelty to animals where the proof established that the defendant intentionally deprived a dog of food and water despite his testimony that he "verbally made it real clear that [he was] no longer holding responsibility for th[e] dog" and in light of his refusal to take the dog to "the pound"), *perm. app. denied* (Tenn. Oct. 10, 2018); *State v. Stewart*, No. W2013-02562-CCA-R3-CD, 2015 WL 3509397, at *13 (Tenn. Crim. App. June 4, 2015) (affirming a defendant's convictions of aggravated cruelty to animals where the proof established that the defendant inflicted excessive cruelty in euthanizing dogs via strangulation was unnecessary, "as the testimony showed that the [d]efendant could have utilized the squeeze gate to contain the dogs and to provide the euthanasia technician with an opportunity to administer a sedative"), *no perm. app. filed*; *Barnett*, 2010 WL 38228800, at *14 (affirming a defendant's conviction of aggravated cruelty to animals where the proof established that the defendant filed a dog's teeth down and beat him "like he meant to hurt him" until the dog lost consciousness in an effort to "discipline" the dog and as a means of "preventing further damage to his property"). Thus, our previous statutory analyses also support the trial court's utilization of an objective standard in this case.

Therefore, we conclude that the plain meaning of the phrase "justifiable purpose" used in the statute means a reasonable, excusable, or defensible objective, goal, or end based upon what a reasonable person would do or perceive under the circumstances known to the person at the time of their actions. Accordingly, the trial court did not err in applying an objective standard in interpreting the statute. The Defendant is not entitled to relief.

B. SUFFICIENCY OF THE EVIDENCE

In a related claim, the Defendant also challenges the sufficiency of what she asserts is uncontroverted evidence establishing her justifiable purpose of preventing the kitten from developing an infection and from dying. The Defendant conceded in the trial court that the method she chose was not the "right" procedure according to veterinary practice. She argues, however, that this has no effect on whether her purpose to prevent an infection or death was a justifiable purpose. The State argues that the Defendant could have taken the kitten to any emergency care animal clinic to alleviate the kitten's pain, but instead she chose to act in a way that did not relieve the kitten's pain and, in fact, "exacerbated" it.

"Findings of guilt in criminal actions . . . shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). The standard of appellate review on a challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citations

omitted) (emphasis in original); *see also State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018). Additionally, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." The verdict of a trial judge in a bench trial is entitled to the same weight on appeal as a jury verdict. *See State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999).

A conviction "removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *see also State v. Thomas*, 687 S.W.3d 223, 249 (Tenn. 2024) (citing *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000)). "On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom." *State v. Wilson*, 211 S.W.3d 714, 718 (Tenn. 2007) (citing *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999)). "We do not reweigh the evidence, because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the . . . trier of fact." *State v. Curry*, 705 S.W.3d 176, 183 (Tenn. 2025) (citations omitted). The same standard of review applies "whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *Williams*, 558 S.W.3d at 638 (first citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011), and then citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977)).

As previously stated, aggravated cruelty to animals was defined in relevant part at the time of the offense as occurring when "[a] person . . . , with no justifiable purpose, . . . intentionally or knowingly . . . [k]ills, maims, tortures, . . . mutilates, . . . or otherwise causes serious physical injury, a substantial risk of death, or death to a companion animal or intentionally causes serious physical injury to a companion animal." Tenn. Code Ann. § 39-14-212(a)(1) (Supp 2021). "'Companion animal' means any non-livestock animal as defined in § 39-14-201(3)," *id*. § 39-14-212(b)(2) (2018), and there is no dispute that the kitten in this case qualified as a companion animal. *See Mainer*, 678 S.W.3d at 725 (concluding that cats are companion animals for purposes of Code section 39-14-212(a)). Our Code also defines "torture" in relevant part as "every act, omission, or neglect whereby unreasonable physical pain, suffering, or death is caused or permitted . . . ." Tenn. Code Ann. § 39-14-201(4).

The Defendant does not challenge the sufficiency of the evidence as to the elements of the offense, except as it relates to the statutory exception where the acts were done with a "justifiable purpose." She argues that to uphold the conviction would be to criminalize

a "well-meaning rescue attempt," which "the statute simply does not support," in that her desire to help the kitten exempted her from liability for aggravated cruelty to animals because it was a "justifiable purpose." The State argues that the purpose was not justifiable because the Defendant caused needless pain and suffering to the kitten, and that the Defendant's actions were disproportionate to her asserted purpose.

In her brief, the Defendant concedes that the evidence viewed in the light most favorable to the prosecution "shows a defendant who intentionally caused serious injury to an animal." However, she asserts that she sought "professional help the next morning when it became available, which is utterly inconsistent with any malicious or ill-intended purpose." However, the evidence is uncontroverted that the kitten came into the Defendant's care on Sunday at approximately 5:00 p.m., and she amputated the kitten's leg at approximately 10:30 p.m. that same evening. The Defendant sought no medical assistance or care on Monday and did not seek care until 3:00 p.m. on Tuesday afternoon. This evidence belies the Defendant's claim that she acted with a justifiable purpose. In fact, the evidence established that the Defendant knowingly and intentionally delayed seeking care after such an admittedly ill-advised choice exposed the kitten to even greater risks of infection and pain. The Defendant admittedly performed the amputation without proper pain medication or anesthesia. She admittedly limited the pain medication she provided to the kitten because she was unsure of the required dosage. The Defendant, who had medical knowledge from her profession as a nurse, did not pursue the less drastic, less painful path of obtaining antibiotics to help prevent infection, as veterinary practices would have suggested. It is further clear from the evidence that the Defendant made the choice without reasonable regard to the additional pain, injury, or risk of death this could cause the kitten. She chose the option for additional pain to the kitten because she did not want the animal euthanized or to have to pay for proper medical care. While she contends that this choice was made to help the kitten, she completely disregarded the consideration that euthanasia was potentially the better option and intentionally performed an unorthodox amputation of the kitten's leg without proper procedures, medications, or follow-up. While she claimed to have stabilized the kitten, she left the bone exposed and did not check the wound from Sunday evening until she handed the kitten over to NHA on Tuesday afternoon.

The record clearly supports the trial court's finding of guilt. The Defendant is not entitled to relief on this issue.

### III. CONCLUSION

Following our review of the record and based upon the foregoing analysis, we affirm the judgment of the trial court.


s/ *Steven W. Sword*

STEVEN W. SWORD, JUDGE